UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SALLY MAE WHITE, | |
| Plaintiff, | No. 11 C 8040 |
| v. | Magistrate Judge Susan E. Cox |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION & ORDER

Ms. Sally Mae White seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). Ms. White filed a Motion for Summary Judgment, seeking a judgment reversing or remanding the Commissioner's final decision [dkt. 19]. For the reasons set forth below, Ms. White's motion is granted and her case is remanded to the SSA for further proceedings.

## I.    PROCEDURAL HISTORY

On April 4, 2007, Ms. White applied for disability insurance benefits and supplemental security income claiming that a combination of impairments, including knee pain, foot cramps, high blood pressure, and depression, prevented her from working.[1] The Commissioner denied

---

[1] R. at 163-67, 186.

Ms. White's applications initially on May 30, 2007, and upon reconsideration on August 31, 2007.[2] Ms. White subsequently requested a hearing with an Administrative Law Judge ("ALJ").[3]

A hearing took place in front of ALJ John Kraybill on March 11, 2009.[4] Following the hearing, the ALJ issued a decision denying benefits, concluding that Ms. White was not disabled within the meaning of the Act at any time after her application was filed.[5]  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.[6] Ms. White filed this action on November 11, 2011.

## II.     FACTUAL BACKGROUND

This section is a brief review of the facts in the medical record that the ALJ reviewed at Ms. White's hearing and considered when rendering his decision. These facts provide a summary of Ms. White's medical history and the reasons she applied for disability. We begin with her personal history and continue with an overview of her short medical record from before her application for disability. Next, we discuss her application and her medical history following her application until her ALJ hearing. We then summarize the ALJ hearing testimony and the ALJ's decision.

---

[2] R. at 114-18, 125-34.
[3] R. 135-36.
[4] R. at 75.
[5] R. at 66.
[6] R. at 15-18.

## A.    Ms. White's Personal Background

Ms. White was born on June 15, 1958, making her 50 years old on the date the ALJ issued his final decision.[7]  She is five feet, seven inches tall and weighed 198 pounds on the date of her application.[8]  Ms. White graduated from high school in 1976.[9]  Two years later, she got a job working as a copy operator at the accounting firm Ernst and Young.[10]  She had her first and only child in 1980, a son who she raised on her own.[11]  Ms. White left Ernst and Young in 1993, after which she held a number of different jobs. She worked on an assembly line at ABC NACO National Casting from 1994-2000.[12]  She also worked as a cook at Preferred Meal Systems from 2003-2005.[13]  Her most recent job was as a housekeeper at Sunrise Senior Living Services from August 2006 to February 2007.[14]  Ms. White married in 2000.[15]  In 2002, Ms. White suffered two separate hardships when her younger sister passed away and she lost her apartment.[16]  In 2004, Ms. White's husband left her.[17]  That same year, her son's first child died of pneumonia at sixteen months of age.[18]  At the time of her application, Ms. White had no income and no resources and she received food stamps.[19]

---

[7] R. at 63, 182.
[8] R. at 185.
[9] R. at 191.
[10] R. at 294.
[11] *Id.*
[12] R. at 193.
[13] R. at 187.
[14] *Id.*
[15] R. at 294.
[16] R. at 393.
[17] R. at 294.
[18] *Id.*
[19] R. at 166.

## B.      Pre-Application Medical History

We begin our review of Ms. White's relevant past medical history starting in 2002 and ending with her application in April 2007. In 2002, Ms. White started to suffer from major depressive disorder. There are no corresponding medical records to document this 2002 diagnosis. However, in 2007, Ms. White's treating psychiatrist, Adedapo Williams, M.D., conducted a medical assessment of her ability to do work related activities based on her mental impairments.[20]  In his assessment, Dr. Williams noted she had suffered from major depressive disorder since February 2002.[21] This is corroborated by another record from a visit to Dr. Williams in February 2007, wherein he noted that Ms. White alleged she suffered from depression all her life, but it got worse in 2002 when her sister died and she lost her apartment.[22]

The bulk of Ms. White's medical records are from 2006-2009. In June 2006, Ms. White went to Fantus Health Clinic complaining of bilateral knee pain and intermittent swelling.[23] Examination of her knees was essentially normal, and she was advised to take Motrin for 10 days.[24] She was next seen in January 2007 for depressive symptoms after having lost her job at Sunrise Senior Living Center.[25] At this visit, Ms. White complained of stress, appetite change, sleep deprivation, and muscle pains.[26] She also said she had knee pain for "many years" made worse by the weather.[27] Additionally, she described grief over her dead grandson.[28]  She was

---

[20] R. at 355.
[21] Id.
[22] R. at 393.
[23] R. at 270.
[24] Id.
[25] R. at 262.
[26] Id.
[27] Id.
[28] Id.

diagnosed with osteoarthritis of bilateral knees and was referred to the Fantus psychiatric clinic for treatment of her symptoms of depression.[29]

The following month, Ms. White went to the Fantus psychiatric clinic and met with her treating psychiatrist, Dr. Williams, for the first time. During this visit, Ms. White complained of insomnia, decreased appetite, and feelings of worthlessness, helplessness, guilt, and hopelessness.[30] Dr. Williams diagnosed Ms. White with major depressive disorder and prescribed her two antidepressant medications.[31] Finding herself unresponsive to medication, Ms. White returned to Dr. Williams in March 2007 alleging nothing had changed.[32] After a mental status examination ("MSE"), Dr. Williams noted that she was tearful and dysphoric.[33] He assessed her with poor response to her medication and adjusted it.[34] That same month at an annual female examination, Ms. White reported feeling depressed and was assessed with reactive depression due to the death of her grandson.[35]

## C.    Application for Disability

Ms. White applied for disability benefits and supplemental security income on April 4, 2007, complaining of right foot cramps, depression, stress, and high blood pressure.[36] In her application, Ms. White alleged her disabilities first began to interfere with her work on January 1, 2007.[37] She was unable to carry the mop and bucket necessary for her cleaning position at the

---

[29] R. at 263.
[30] R. at 394.
[31] Id.
[32] R. at 397.
[33] Id.
[34] Id.
[35] R. at 274.
[36] R. at 186.
[37] Id.

Sunrise Senior Center, and her pain prevented her from working fast enough.[38]  Ms. White indicated that she stopped working altogether on February 14, 2007. She alleged that she is unable to do even simple jobs because her right foot cramps so severely that she is forced to sit down.[39]  She also reported that she cries every day.[40]  The SSA representative who filled out the disability report observed that she had no trouble sitting, standing, or walking.[41]

Following her application, Ms. White underwent an internal medicine consultative examination for the bureau of disability determination services in May 2007.[42]  The evaluation was conducted by Peter Biale, M.D., who assessed her with painful knees, a painful right foot, and psychiatric problems.[43] Dr. Biale's examination of her right foot and ankle did not reveal any gross abnormality.[44] Dr. Biale also concluded that Ms. White's "painful knees" had no limitations.[45] The range of motion testing of her back and joints were also within normal limits.[46]

Also in May 2007 as part of her application, Ms. White underwent a psychiatric evaluation by Harley G. Rubens, M.D., a consultant for the bureau of disability determination services.[47]  Dr. Rubens diagnosed her with a dysthymic disorder and an adjustment disorder, with mixed anxiety and depression.[48] During this evaluation, Ms. White described daily activities that included doing some light cleaning, microwave cooking, laundry, going grocery shopping

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] R. at 183.
[42] R. at 297.
[43] R. at 300. Although Dr. Biale assessed Ms. White with psychiatric problems, he left it to Dr. Harley Rubens to address them in Dr. Rubens' concurrent psychiatric evaluation of Ms. White.
[44] *Id.*
[45] *Id.*
[46] R. at 297-300.
[47] R. at 293.
[48] R. at 296.

with her mother, watching television, reading the Bible, and going to church every Sunday.[49] She alleged cyclic feelings of sadness and depression, but said she was able to continue to focus and function.[50] Dr. Rubens wrote that she described adjustment anxiety and depression because of finances; losses of loved ones including a grandchild and a failed marriage; and anxiety about her future and the pain she experienced in her knees.[51] Ms. White was given a Global Assessment of Functioning ("GAF") Scale (DSM- IV Axis V) score of 65, indicative of someone with mild symptoms but functioning pretty well.[52]

### D.    Period Between Ms. White's Application and Her ALJ Hearing

In May 2007, Ms. White went to the emergency room at Stroger Hospital complaining of knee stiffness and pain with sitting and standing.[53] The x-ray revealed arthritis and she was again diagnosed with depression and degenerative joint pain in both knees.[54] In June 2007, Ms. White returned to the Stroger Hospital emergency room for pain in her right foot, but the x-ray taken during that visit was within normal limits.[55]

During a psychiatric visit to Dr. Williams in June 2007, Ms. White voiced symptoms of poor sleep, tiredness, general anxiety, paranoia, arthritis pain, and feeling hopeless and helpless.[56] Dr. Williams noted she still had poor response to her medications and subsequently adjusted them.[57] Ms. White returned to Dr. Williams the following month with complaints of

---

[49] R. at 294.
[50] R. at 296.
[51] *Id.*
[52] *Id.*
[53] R. at 291.
[54] R. at 292.
[55] R. at 328.
[56] R. at 398.
[57] *Id.*

having crying spells and suicidal ideas with no plan or intent.[58] Ms. White also complained of poor sleep and poor appetite.[59] Despite these complaints, Dr. Williams' progress notes from that visit indicated Ms. White's MSE was "essentially unremarkable."[60]

On July 30, 2007, Dr. Williams completed a medical assessment of Ms. White's condition and ability to do work-related activities based on mental impairments.[61] He opined that Ms. White had a "moderate" limitation due to tiredness, poor concentration, and low stress tolerance.[62] Dr. Williams also indicated that Ms. White was moderately limited in the ability to understand, remember and carry out short and simple instructions, maintain attention and concentration for extended periods, and she was markedly limited with detailed instructions.[63]

Dr. Williams also determined Ms. White was markedly limited in sustaining an ordinary routine without special supervision; markedly limited in maintaining regular attendance or performing activities within a schedule; and markedly limited in *all* areas of social interaction and adaptation.[64] Dr. Williams further assessed the plaintiff with marked limitations in completing a normal workweek without interruptions from psychologically based symptoms.[65]

In October 2007, Ms. White again sought treatment, and Stroger Hospital records included complaints of right foot pain and the x-rays revealed degenerative joint disease.[66] During this visit, Ms. White said her medications were still not helping her mood and she was

---

[58] R. at 399.
[59] *Id.*
[60] *Id.*
[61] R. at 356.
[62] *Id.*
[63] R. at 357.
[64] R. at 357-58 (emphasis added).
[65] R. at 358.
[66] R. at 390.

referred to Dr. Williams for a medication adjustment.[67] Dr. Williams saw her again for a follow-up on February 6, 2008, when she presented with no psychotic symptoms or suicidal ideation.[68] However, he did assess her with "pain syndrome."[69] On February 18, 2008, when seen at Stroger for lab results, Ms. White denied any symptoms from her history of depression.[70] Additional records dated May 13, 2008, show Ms. White "feels better" but still experienced occasional crying spells, isolated herself, and felt uncomfortable in social situations.[71] The assessment indicated she was "improving."[72] Six days later, she returned to Stroger for follow-up for her foot problem and also complained of depression.[73] She was referred for a psychiatric appointment with Dr. Williams.[74] Based on the note from her medical visit to Stroger, the appointment with Dr. Williams was scheduled for May 29, 2008.[75] However, there is no record to confirm whether that visit actually took place. On September 19, 2008, Ms. White went to Stroger hospital complaining of left foot pain.[76] An x-ray of her foot was taken that revealed a very small plantar spur.[77] This the last medical record in Ms. White's file.

## D.      The March 11, 2009 Hearing

Ms. White appeared and testified at a hearing held on March 11, 2009, in Chicago, Illinois, before ALJ John Kraybill.[78] Her attorney, Stephen Jackson, was also present.[79]  Also

---

[67] R. at 388.
[68] R. at 400.
[69] Id.
[70] R. at 409.
[71] R. at 424.
[72] Id.
[73] R. at 425.
[74] R. at 424, 427.
[75] R. at 426.
[76] R. at 433.
[77] Id.
[78] R. at 75.
[79] R. at 66.

appearing and testifying were Mark I. Oberlander, Ph.D., an impartial medical expert; and Thomas A. Gusloff, an impartial vocational expert.[80]

## 1.    Ms. White's Testimony

Ms. White began her testimony by confirming that although she used to live with a friend, she has lived by herself since October.[81]  She described her most recent job as a part time housekeeper.[82]  She testified that she quit because she was physically incapable of fulfilling her job requirements.[83]  She was required to carry a "big mop bucket" up a flight of stairs and her boss told her she took too long.[84]  She testified that she was given time off but decided not to return to work because she was unable to do the work she was required to do.[85]  Ms. White also confirmed that she had not worked at any job since February 14, 2007.[86]

In terms of Ms. White's life and daily activities outside of work, she testified that during the day she lies on the floor and watches television because it makes her feel better.[87] Moving from her position on the floor is difficult.[88] She does not get dressed, shower, or leave the house every day.[89]  She cooks some of her own microwave meals, but her mother takes her shopping and helps with laundry.[90] She testified that she is extremely reliant on her mother to take care of

---

[80] R. at 75.
[81] R. at 78.
[82] R. at 79.
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] R. at 90.
[88] *Id.*.
[89] R. at 91.
[90] R. at 83.

her.[91]  Ms. White also testified that she goes to church every week and is greatly comforted by this activity.[92]

In terms of Ms. White's physical health, she reported that she has pain in her knees and hands but the worst pain she felt was in her left heel.[93]  She had previously been given a cortisone shot for the pain, which helped for a few weeks, but her heel became infected and now her pain is worse than before.[94]  Her knees swell and throb with pain.[95]  She testified that she can only walk one block before she needs to stop and rest.[96]  She alleged that she can carry a couple of pounds, but cannot grip for long periods of time because of the pain in her hand.[97]  She also testified that her hands and back are stiff in the morning.[98]  Although she received general assistance from the state, she was denied a Medicaid card.[99]

In terms of Ms. White's mental health, she testified that she has never been hospitalized for depression, but she is sad all the time and often cries for no reason.[100]  She has trouble sleeping and eats only once a day.[101]  She also described instances where she heard voices calling her name.[102]

---

[91] *Id.*
[92] R. at 82.
[93] R. at 80, 85, 87.
[94] R. at 81.
[95] R. at 86.
[96] R. at 85.
[97] R. at 85, 88.
[98] R. at 87-88.
[99] R. at 82.
[100] R. at 81.
[101] R. at 82, 90.
[102] R. at 89-90.

## 2.     Medical Expert Testimony

Dr. Oberlander, the medical expert in this case, testified that he never physically examined Ms. White, but that he had reviewed her medical record prior to the hearing.[103]   He further testified that it was his opinion that Ms. White's medical evidence supported impairments under two different Social Security listings.[104]   He first discussed Ms. White's affective disorder under listing 12.04. He noted the various symptoms Ms. White had reported to treating sources at Fantus Health clinic, including hypertension, sleep disturbance, psycho motor agitation, anxiety, feelings of worthlessness, restlessness, and feeling on edge.[105]   He then noted a concurrence between Ms. White's treating sources at Fantus and Dr. Rubens' consultative report.[106]  Dr. Oberlander stated it was his clinical opinion that Ms. White's affective disorder was in part due to her non-mental issues, namely her alleged knee and foot pain.[107]

Dr. Oberlander then went on to point out that the majority of Ms. White's medical records were for medication renewal and not psychiatric treatment.[108]   He also determined that there was "significant fluctuation of reported symptoms' severity" in her contacts with treating physicians.[109]   Dr. Oberlander testified that "the claimant with some frequency denies actual psychiatric symptomatology."[110]    In support of this testimony, he pointed to Ms. White's medical record dated February 19, 2008, wherein the treating source noted that she denied

---

[103] R. at 94.
[104] R. at 94-95.
[105] R. at 95.
[106] *Id.*
[107] *Id.*
[108] R. at 96.
[109] *Id.*
[110] *Id.*

symptoms of depression.[111]   Next, he pointed to another medical record dated October 9, 2007, wherein the treating source noted that her medication was not working.[112]

Dr. Oberlander also referenced Dr. Rubens' consultative report in his testimony.[113]   He testified that according to that report, Ms. White's activities of daily living are within normal limits.[114]   Dr. Oberlander testified that her symptoms listed in the report did not "quite add up to a major depressive disorder."[115]   Dr. Oberlander stressed the indications in the report that some of Ms. White's affective disorder is reactive and could represent unresolved grief over a number of significant losses.[116]   In his final comments on the consultative report, Dr. Oberlander testified that Dr. Rubens assigned Ms. White a GAF score of 65 and there was no evidence in the record to suggest a change from that level of functionality.[117]

Dr. Oberlander also testified that a record dated May 13, 2008, and signed by Dr. Williams indicated that Ms. White's mental status was improving.[118]   This testimony was followed by additional testimony that six days later, Ms. White returned to Dr. Williams who noted that her symptoms of depression continued despite her medication.[119]   At this point, Dr. Oberlander asked Ms. White if she had been back to Dr. Williams since May 2008, the last

---

[111] *Id.*
[112] *Id.*
[113] R. at 96-97.
[114] R. at 97.
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*

recorded visit in the record.[120]  Ms. White responded that she did not recall if she had seen Dr. Williams since that date.[121]

Next, Dr. Oberlander discussed his opinion regarding Ms. White's functional limitations.[122]  He testified that on psychiatric grounds alone, "totally disregarding nonmental issues," it was his opinion that any restrictions on Ms. White's daily activities are mild based on Listings 12. 04 and 12.06.[123]  He further testified that her limitation on social functioning is moderate; her limitation on maintaining concentration, persistence, and pace is moderate; and there was insufficient evidence to support any periods of decompensation.[124]  It was his opinion that criteria under 12.04 and 12.06 were not met in Ms. White's case.[125]

At this point, the ALJ asked Dr. Oberlander if there would be any limitations on Ms. White's RFC as a result of her impairments.[126]  Dr. Oberlander testified that Ms. White retains capacity for engagement in simple, repetitive work activities involving one or two step operations.[127]  He recommended less than extensive contact with the public and coworkers.[128]  He also recommended vocational activities that are less than highly stressful.[129]  Finally, he testified that in his opinion, Ms. White retains a capacity to engage in work activities that involve some changes in routine and tasks.[130]

---

[120] R. at 98.
[121] *Id.*
[122] R. at 99.
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] *Id.*
[130] *Id.*

Next, Ms. White's counsel asked Dr. Oberlander some questions about her medication and her suicidal thoughts.[131] Dr. Oberlander testified that he was not qualified to comment on her medication because he is not a medical practitioner, but that her medication "would seem appropriate."[132] Regarding Ms. White's suicidal thoughts, Dr. Oberlander requested permission to ask Ms. White directly to elaborate.[133]

Ms. White testified that she had thoughts of suicide "all the time."[134] Specifically, she described thoughts of overdosing on her medication or stepping in front of a car.[135] In response to a question from the medical expert, Ms. White testified that her suicidal thoughts did not have to do with her pain.[136] Rather, she attributed these thoughts to her feelings of hopelessness and tiredness.[137] There was no additional follow up regarding Ms. White's testimony about her suicidal thoughts. Immediately following her statements on the topic, Dr. Oberlander resumed his testimony. In response to a question from Ms. White's attorney, Dr. Oberlander testified that he did not recall reading any reference to auditory hallucinations in Ms. White's medical record.[138] Before the hearing concluded, Ms. White's attorney pointed out a reference in her medical record to her complaints of auditory hallucinations.[139] Dr. Oberlander concluded his testimony by saying he did not see any indications of doctors describing malingering or symptom magnification anywhere in the medical record.[140]

---

[131] R. at 100.
[132] *Id.*
[133] R. at 102.
[134] *Id.*
[135] R. at 102-103.
[136] R. at 103.
[137] R. at 102.
[138] R. at 103.
[139] R. at 112.
[140] R. at 104.

3.      **Vocational Expert Testimony**

At this point in the hearing, the ALJ directed questions to the vocational expert, Thomas Gustav. After a brief recitation of his qualifications, the vocational expert asked Ms. White about her prior work history.[141]  The vocational expert then went on to give his opinion regarding Ms. White's past relevant work.  He testified that Ms. White's past relevant work as a machine core maker was a medium demand, semi-skilled position.[142] Her past work as a head cook was skilled and generally considered to be medium work, but it was light work as she performed it.[143] The vocational expert testified further that her work as a housekeeper was a light, unskilled job.[144]

The vocational expert then testified that given Ms. White's age, education, work experience, and residual functional capacity, she would not be able to perform her past work.[145] It was his testimony that she would be able to perform the requirements of representative occupations such as linen grader/sorter, cafeteria attendant, and folding machine operator in laundry.[146]

In response to questions from Ms. White's attorney, the vocational expert testified that the jobs he listed would require "frequent handling and fingering."[147]  The vocational expert also testified that the cafeteria attendant position required frequently lifting more than ten pounds.[148] Finally, Ms. White's attorney mentioned that her treating psychiatrist found her to be markedly

---

[141] R. at 105.
[142] R. at 107.
[143] *Id.*
[144] R. at 108.
[145] *Id.*
[146] *Id.*
[147] R. at 109.
[148] R. at 110.

limited in her ability to complete a normal work day and work week without interruptions due to her psychological symptoms.[149]    Ms. White's attorney asked how this limitation, when translated into a likelihood of being absent from work more than twenty percent of the time, would impact her ability to perform the jobs the vocational expert listed.[150]   The vocational expert concluded that such a limitation would not be compatible with competitive employment in general or long term employment in the specific positions he mentioned.[151]

**E.    The ALJ Decision**

In his opinion issued March 27, 2009, the ALJ concluded Ms. White was not disabled within the meaning of the Social Security Act from February 14, 2007, through the date of this decision and was not entitled to any DIB and SSI.[152]   In reaching this conclusion, the ALJ followed the five-step evaluation process outlined in 20 C.F.R. § 404.1520(a)(4).

The ALJs' first step is to consider whether the claimant is presently engaged in any substantial gainful activity, which would preclude a disability finding.[153]    In this case, the ALJ found that Ms. White had not engaged in any substantial gainful activity since her alleged onset date of February 14, 2007.[154]  The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[155]   In the present case, the ALJ

---

[149] R. at 111.
[150] *Id.*
[151] *Id.*
[152] R. at 66.
[153] 20 C.F.R.§ 404.1520(a)(4)(i).
[154] R. at 68.
[155] 20 C.F.R.§ 404.1520(a)(4)(ii).

concluded that Ms. White had the following severe impairments: degenerative joint disease of bilateral knees, affective disorder, major depressive disorder, and anxiety disorder.[156]

The ALJ's third step is to consider whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[157] In this case, the ALJ determined that Ms. White's impairments did not meet or medically equal a listed impairment, even in combination, under 20 C.F.R. Part 404, Subpart P, Appendix 1.[158] In reaching this conclusion, the ALJ considered whether Ms. White's affective disorder satisfied the criteria of an adult mental disorder under sections B and C of Listing 12.0. To satisfy the B criteria, the claimant's condition must have resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

In this case, the ALJ determined that Ms. White had mild restriction in activities of daily living and moderate difficulties in social functioning, concentration, and persistence or pace.[159] The ALJ also determined that Ms. White had exhibited no episodes of decompensation.[160] Therefore, the ALJ found the B criteria were not satisfied.[161] He also considered whether the paragraph C criteria were satisfied, and concluded the evidence failed to establish the presence of that criteria as testified to by the medical expert at the hearing.[162]

---

[156] R. at 68.
[157] 20 C.F.R.§ 404.1520(a)(4)(iii).
[158] R. at 68.
[159] R. at 69.
[160] *Id.*
[161] *Id.*
[162] *Id.*

In reaching these conclusions, the ALJ relied on the medical expert's testimony that the claimant's mental impairment did not meet or equal the criteria of Listings 12.04 and 12.06.[163] The ALJ also considered the opinions of the Disability Determination Services ("DDS") medical consultants who have evaluated Ms. White's application at the initial and reconsideration levels of the administrative review process and reached the same conclusion.[164]

In the event that no impairments are found to meet SSA listing requirements, the ALJ proceeds to the fourth step of the test, which is to determine whether the claimant is able to perform her past relevant work.[165] This involves evaluating Ms. White's residual functional capacity ("RFC") based on the record and her testimony and comparing it to the requirements of her past work.[166] A claimant's RFC represents what a claimant can perform despite her physical or mental limitations.[167] If determining the claimant's RFC requires the ALJ to assess subjective complaints, then he follows a two-step process.[168] First, he determines whether there is an underlying medically determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's symptoms.[169] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on his ability to do basic work activities.[170] When making determinations about the credibility of the claimant's subjective complaints, the ALJ must consider the entire

---

[163] *Id.*
[164] R. at 68.
[165] 20 C.F.R.§ 404.1520(a)(4)(iv).
[166] *Id.*
[167] 20 C.F.R.§ 404.1545(a)(4).
[168] *Id.* at § 404.1529.
[169] *Id.* at § 404.1529(b).
[170] *Id.* at § 404.1529(c).

record.[171]  If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, she is found not to be disabled.

In assessing Ms. White's RFC, the ALJ determined that she would be unable to perform past relevant work.[172]  However, the ALJ found that she could perform a limited range of unskilled, simple, repetitive work that was low stress without high performance goals and involved less than extensive contact with the public, coworkers, or supervisors.[173]

In assessing Ms. White's subjective physical complaints, The ALJ reviewed her entire medical record. He noted her many visits to Stroger hospital for pain in her knees and heels.[174] The ALJ also referenced Ms. White's forensic physical evaluation in May 2007 in which Dr. Biale assessed her with a painful right foot and painful knees.[175]  The ALJ stated that Dr. Biale's examination of Ms. White's right foot and ankle did not reveal any gross abnormality and her knees had no limitations.[176]

In assessing Ms. White's subjective mental complaints, the ALJ reviewed the medical expert's testimony that she has some limitations due to an affective disorder and a generalized anxiety disorder.[177]  The ALJ also referenced Ms. White's psychiatric consultative evaluation in May 2007 by Dr. Rubens wherein he diagnosed her with a dysthymic disorder, and an adjustment disorder, with mixed anxiety and depression.[178]  The ALJ also noted that Dr. Rubens'

---

[171]  *Id.* at § 404.1529(c)(4).
[172]  R. at 72.
[173]  R. at 69.
[174]  R. at 70.
[175]  *Id.*
[176]  *Id.*
[177]  *Id.*
[178]  R. at 71.

report included a conclusion that Ms. White was capable of fairly active daily activities including shopping, microwave cooking, and light cleaning.[179]   The ALJ further noted that Dr. Rubens gave Ms. White a GAF score of 65, indicative of someone with mild symptoms but functioning pretty well.[180]

Next, the ALJ considered the opinions of Dr. Williams, Ms. White's treating psychiatrist. Dr. Williams completed a medical assessment of Ms. White's condition and ability to do work-related activities based on mental impairments.[181]   The ALJ noted that Dr. Williams concluded that his patient had a "moderate" limitation due to tiredness, poor concentration, and low stress tolerance.[182]   She was moderately limited in the ability to understand, remember and carry out short and simple instructions; and maintain attention and concentration for extended periods; but would be markedly limited with detailed instructions.[183]   He also wrote that she was markedly limited in all areas of social interaction and adaptation.[184]   The ALJ noted that at that point in time, Dr. Williams had only seen Ms. White at an initial assessment and three medication management visits.[185]

Finally, the ALJ referenced medical records dated May 13, 2008, that noted Ms. White "feels better" but still experienced occasional crying spells, isolated herself, and felt uncomfortable in social situations.[186]   The assessment indicated that she was improving.[187]

---

[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] R. at 71-72.
[184] R. at 72.
[185] *Id.*
[186] *Id.*
[187] *Id.*

Based on his review of the entire record, the ALJ concluded that Ms. White's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms.[188]  However, the ALJ concluded that Ms. White's statements regarding the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with her RFC assessment.[189]

In evaluating the weight to be given to Ms. White's various medical sources, the ALJ concluded that the opinions of the medical expert, Dr. Oberlander, were consistent with the record as a whole and were therefore given "substantial weight."[190]  The ALJ reasoned that unlike most of Ms. White's other medical sources, the medical expert had the opportunity to review the claimant's entire record and listen to her testify.[191]  The ALJ concluded that as a result, the medical examiner was familiar with the claimant's longitudinal medical record.[192]

After the ALJ determined that Ms. White was incapable of returning to past work, he proceeded to the fifth step of the test, which was to evaluate whether Ms. White was able to perform any other work existing in significant numbers in the national economy.[193]  The ALJ determined, that considering her age, education, work experience, and RFC, that jobs existed in significant numbers in the national economy that she could perform.[194]  Based on the vocational expert's testimony, the ALJ determined that Ms. White could perform jobs in the Chicagoland

---

[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] R. at 73.
[194] *Id.*

area as a linen grader or sorter, cafeteria attendant, and folding machine operator.[195] Since there

were jobs available that Ms. White could perform, she was not disabled as defined by the Act.[196]

## III.    STANDARD OF REVIEW

The Court will affirm the Commissioner's denial of disability benefits if it is supported

by substantial evidence.[197] Substantial evidence consists of "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."[198] This evidence must be

"more than a scintilla but may be less than a preponderance."[199] In this substantial-evidence

determination, the Court considers the entire administrative record but does not reweigh

evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own

judgment for that of the Commissioner.[200] Nevertheless, the Court conducts a "critical review of

the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it

lacks an adequate discussion of the issues.[201]

## IV.    ANALYSIS

Ms. White now seeks the Court's review pursuant to 42 U.S.C. sections 405(g) and

1383(c)(3), alleging that (1) the ALJ did not properly consider Ms. White's treating

psychiatrist's opinion evidence; (2) the ALJ failed to set forth a credibility analysis of Ms. White

---

[195] *Id.*
[196] R. at 74.
[197] *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir.2008).
[198] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
[199] *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007).
[200] *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir.2003).
[201] *Id.*

as required by Social Security Ruling 96-7p; and (3) the ALJ did not properly assess the impact of Ms. White's obesity, fatigue, and tiredness.

## A.    Consideration of the Treating Psychiatrist Opinion: Dr. Williams.

First, Ms. White argues that the ALJ did not properly consider the opinions of her treating psychiatrist Dr. Williams.[202]   Ms. White asserts that Dr. Williams' opinions were supported by substantial evidence in her medical record and, therefore, should have been given controlling weight over the opinions of the medical examiner. The Commissioner responds that the ALJ reasonably found that Dr. Williams' opinions were not entitled to controlling weight.[203]

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight unless the opinion is not supported by the medical findings and is inconsistent with substantial evidence in the record.[204]   Whenever an ALJ rejects a treating source's opinion, he must give a sound explanation for that decision.[205]   In this case, the ALJ gave substantial weight to the opinions of the medical expert, Dr. Oberlander.[206] The ALJ gave two reasons in support of this decision: first, the medical expert's opinion was "consistent with the record as a whole" and second, the medical expert "had the opportunity to review Ms. White's entire record and listen to her testify."[207]

First we consider the ALJ's determination that Dr. Oberlander's opinion was consistent with the record as a whole. We find this is not a sound explanation for failing to explain the

---

[202] Pl. Mot. at 5-9.
[203] Com. Resp. at 3.
[204] *See* 20 C.F.R. § 404.1527(c).
[205] 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 305–06 (7th Cir.2010).
[206] R. at 72.
[207] *Id.*

weight afforded the treating psychiatrist's opinion, if any. It is permissible to discount the treating psychiatrist's opinion when it is internally inconsistent or inconsistent with the record as a whole.[208] In his response brief, the Commissioner makes this assertion (that Dr. Williams' opinion was not consistent with the record as a whole, including his own treatment notes).[209] However, the ALJ's decision can only be defended on grounds specifically provided by the ALJ.[210] In this case, the ALJ did not expressly state that Dr. William's opinion was either internally inconsistent or inconsistent with the record as a whole. The ALJ only states that "[u]nlike most of the claimant's other medical sources, [the medical expert] had the opportunity to review the claimant's entire record and listen to her testify. As a result he was familiar with the claimant's longitudinal medical record."[211] It is not enough for the Commissioner to argue the reasoning the ALJ might have had after the fact.[212] The reasons for discounting the treating psychiatrist's opinion must be explained, not implied.[213] An "ALJ's decision cannot leave the weight given to the treating physician's testimony to mere inference: the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight."[214]

We next consider the ALJ's second reason for affording the medical expert's opinions substantial weight; he had the opportunity to review Ms. White's entire record and listen to her

---

[208] 20 C.F.R. § 404.1529(c).

[209] Com. Resp. at 4.

[210] *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

[211] R. at 72.

[212] *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

[213] *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (determining that to the extent that the ALJ considered the treating psychiatrist's assessments inconsistent or unsupported by the record, it was incumbent on the ALJ to explain why); *see also Dobrecevich-Voelkel v. Astrue*, 776 F. Supp. 2d 878, 884 (E.D. Wis. 2011) (making inferences from parts of an ALJ's opinion is seldom enough for a reviewing court to conclude that the proverbial "logical bridge" has been made).

[214] *Ridinger v. Astrue*, 589 F.Supp.2d 995, 1006 (N.D.Ill.2008); *see also* 20 C.F.R. § 404.1527(d).

testify. The Commissioner does not address this. Neither the ALJ nor the Commissioner explain why hearing Ms. White testify on one occasion is more probative than hearing her several times over the course of a year as Dr. Williams had. Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to conclusion.[215] We find that the ALJ's reason does not build the requisite logical bridge.

Even if the ALJ provided sound reasons for refusing to give Dr. Williams' opinion controlling weight, the ALJ could not simply reject the opinion.[216] The ALJ must still determine what weight the opinion should be assigned by discussing the length, nature, and extent of the treating relationship; the supporting evidence in the record; the consistency of the opinion with the record; and the physician's medical specialty.[217] Whatever weight the ALJ decides to afford the treating physician's opinion, he must provide "good reasons" for his decision.[218] Here, the ALJ did not include any such discussion about the weight he gave to Dr. Williams' opinions or ultimate assignment of weight. As noted, the ALJ afforded the medical expert's opinions substantial weight, but it remains unclear what weight - if any - the ALJ afforded Dr. Williams' opinions.

We should mention that the ALJ touches on one of the weight assignment factors required under 20 C.F.R. section 404.1527(c) when he references the length of treatment and frequency of examination. Specifically, the ALJ notes that the treating psychiatrist only saw Ms.

---

[215] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010).
[216] *See* 20 C.F.R. § 404.1527(c).
[217] *Id.*
[218] *Id.*

White four times when he made his assessment of her condition and ability to do work related activities.[219] But the ALJ does not expressly connect that number of visits with any potential deficiency in the treating psychiatrist's opinion. Nor does the ALJ cite this as a reason for discounting Dr. Williams' opinions. Finally, the ALJ does not discuss why the opinion of the examining psychiatrist made after four visits over the course of a year would be less reliable than the opinion of Dr. Oberlander, the non-examining psychologist.

## B.    Ms. White's Credibility Regarding the Severity of Her Complaints

Ms. White also argues that the ALJ impermissibly declined to follow the requirements of Social Security Ruling 96-7 in making his credibility determination of Ms. White's testimony regarding her symptoms.[220]    Ms. White contends that the ALJ merely stated in a conclusory fashion that Ms. White's statements concerning the intensity, persistence, and limiting effects of her symptoms were note credible to the extent they were inconsistent with the residual functional capacity assessment.[221]    The Commissioner asserts that the ALJ's decision reflects that he considered multiple factors in assessing Ms. White's subjective complaints.[222]    The Commissioner also urges that the ALJ's credibility determination is entitled to substantial deference and should not be disturbed unless it is patently wrong.[223]

In finding that Ms. White's subjective complaints are not credible, the ALJ need not accept them if they conflict with objective evidence in the record.[224]    However, he must

---

[219] R. at 72.
[220] Pl. Mot. at 12.
[221] *Id.*
[222] Com. Resp. at 8.
[223] Com. Resp. at 7 (relying on *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).
[224] *Arnold v. Barnhart*, 473 F.3d 816, 822-23 (7th Cir. 2007).

thoroughly examine the evidence and clearly articulate his findings.[225]   This is because in reviewing the ALJ's decision, we do not assess the whole record, only the reasons he gives.[226]  A negative determination of credibility must "contain specific reasons for the finding . . . supported by evidence . . . and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[227]

In this case, the ALJ first reviews Ms. White's testimony about her activities of daily living, that she has had worse pain in the left heel, that she can walk one block, can only carry a "couple of pounds," that her hands are stiff in the mornings, and that though she has never been hospitalized for depression, she can start crying for no reason and sometimes hears voices.[228]

Then the ALJ states:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.[229]

There is literally no additional discussion of credibility anywhere in the ALJ's decision. The ALJ's conclusory language "yields no clue to what weight the trier of fact gave the testimony."[230]  The Commissioner argues that the ALJ considered the applicable medical signs

---

[225] *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2007).
[226] *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).
[227] *Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).
[228] R. at 72.
[229] R. at 72.
[230] *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir.2011); *Martinez v. Astrue*, 630 F.3d 693, 696–97 (7th Cir.2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir.2010).

and laboratory findings and also considered Ms. White's "fairly active daily activities" in assessing Ms. White's physical impairments.[231]   But the ALJ does not list any specific discrepancies between Ms. White's testimony and the rest of her medical record or highlight any specific deficiencies in Ms. White's testimony.   Unfortunately, without more we cannot determine whether the ALJ properly assessed the credibility factors mandated by Social Security Ruling 96-7p.

## C.    Assessment of Ms. White's Obesity, Fatigue, and Tiredness

Ms. White also argues that the ALJ failed to assess not only her obesity, as required by Social Security Ruling 02-1p, but also improperly omitted any discussion of her fatigue and tiredness in her RFC under Social Security Ruling 96-8p.[232]   The Commissioner responds that the ALJ's failure to address certain specific findings does not render his decision unsupported by substantial evidence because an ALJ need not address every piece of evidence in his decision.[233]

First, an ALJ must consider any limiting effects of obesity on a claimant's overall condition even if the claimant does not cite obesity as an impairment.[234]   But a failure to explicitly consider the effects of obesity may be harmless error when the claimant fails to articulate how her obesity limits her functioning and exacerbates her impairments.[235]   In this case, Ms. White did not claim obesity as an impairment or explain how her obesity affects her

---

[231] Com. Resp. at 8.
[232] Pl. Mot. at 14-15.
[233] Com. Resp. at 6 (relying on *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002)).
[234] *Prochaska v. Barnhart,* 454 F.3d 731, 736–37 (7th Cir.2006); *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir.2000).
[235] *See Prochaska,* 454 F.3d at 736–37; *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004).

ability to work. The record contains a few references to her weight.[236]  However, neither Ms. White nor any of her examining physicians expressly connected her weight to her physical limitations. And neither Ms. White nor her attorney mentioned her obesity during her hearing before the ALJ. Therefore, the ALJ's failure to expressly consider the impact of Ms. White's obesity was likely harmless error.

Next, an ALJ's failure to assess fatigue and tiredness under Social Security Ruling 96-8p may constitute reversible error when the record supports that these symptoms were related to functional limitations and restrictions.[237]  In this case, we acknowledge that Ms. White's medical records contain references to her insomnia, sleep disturbances, and subsequent tiredness and fatigue.[238]  In her testimony before the ALJ, she mentioned having difficulty sleeping and feeling tired.[239]  However, her attorney did not inquire about those symptoms in his examination of the medical and vocational experts. No examining or consulting physicians other than Dr. Williams attributed Ms. White's impairments to fatigue or tiredness. In his opinion, the ALJ did not discuss Ms. White's tiredness and fatigue except to note that during a June 2007 visit to Dr. Williams, Ms. White voiced symptoms of poor sleep, and tiredness, and to note that during Dr. Williams' July 2007 evaluation he assessed her with a moderate limitation due to tiredness.[240] But in her application and subsequent hearing, Ms. White did not specify how these impairments

---

[236] R. at 298 (consultative physician describes her as "rather overweight"); R. at 308 (consultative physician describes her as "moderately obese"); R. at 227-228 (Ms. White describes difficulty getting out of bed in the morning, walking, standing, going up and down stairs, and getting in and out of cars).
[237] *See* SSR 96-8p; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).
[238] R. at 202-03, 210, 262, 294, 355, 375, 388, 393, 397-98, 427.
[239] R. at 82, 102-103.
[240] R. at 71.

exacerbated her ability to work, so a remand on this issue would not affect the outcome of this case.[241]

## V.     Conclusion

For the foregoing reasons, Ms. White's motion for summary judgment is GRANTED [dkt. 19] and this case is remanded to the SSA.

IT IS SO ORDERED.

Date:  12/13/12

Susan E. Cox
U.S. Magistrate Judge

---

[241] *See Lovelace v. Barnhart,* 187 Fed. Appx. 639, 646 (7th Cir. 2006)(unpublished) (holding that where a claimant does not specify how certain impairments in the record exacerbated his ability to work, a remand on those issues would not affect the outcome of the case).